THOMAS CRAIG *vs.* JOHN J. WARNER & another.

Suffolk. December 1, 1913. — January 9, 1914.

Present: RUGG, C. J., HAMMOND, BRALEY, & DE COURCY, JJ.

*Equity Pleading and Practice,* Appeal, Master's report. *Equity Jurisdiction,* For contribution.

By the provision of R. L. c. 159, § 26, an interlocutory decree in a suit in equity, which has not been appealed from, is not open to revision upon an appeal from the final decree except so far as it appears to this court that the final decree is erroneously affected thereby. In the present case an interlocutory decree, if properly made, was not appealed from and could not affect the final decree erroneously, and the only question on the appeal from the final decree was whether that decree was in accordance with the pleadings and the findings of the master's report.

In a suit in equity, where the case is referred to a master under an order of court which does not require him to report the evidence but only to report his findings with such facts and questions of law as either party may request, the master's

findings of fact upon unreported evidence cannot be revised, especially where, as in the present case, no inconsistency appears between the master's general conclusion and any of his subordinate findings.

In a suit in equity for the recovery of money alleged to have been advanced by the plaintiff for the benefit of a joint enterprise in which the plaintiff and the defendants had engaged, where it appeared that the money in question was advanced by certain brokers and a master found that the money was advanced by the brokers solely on the plaintiff's account and that he suffered a loss that was incurred in the prosecution of the joint enterprise, it was *held*, that a finding was justified that the defendants were liable to the plaintiff for one half the amount of the loss.

BILL IN EQUITY, filed in the Superior Court on June, 7, 1911, by Thomas Craig of Liverpool in the United Kingdom of Great Britain and Ireland, doing business under the name of Thomas Craig and Company, against two citizens of this Commonwealth doing business as copartners under the firm name of S. S. Vinal and Company, for an accounting between the plaintiff and the defendants as to an alleged joint enterprise and the recovery of a balance alleged to be due to the plaintiff for advances made and expenses incurred on account of such enterprise.

The case was referred to James P. Parmenter, Esquire, as master, who was directed "to hear the parties and their evidence and report his findings to the court together with such facts and questions of law as either party may request." His report was in substance as follows:

The plaintiff was a dealer in damaged cotton in Liverpool and the defendants were dealers in damaged cotton in Boston. In May, 1908, an agreement was made between the plaintiff and the defendants, contained chiefly in a letter from the defendants to the plaintiff, dated May 4, 1908, whereby the defendants agreed to buy from time to time, as occasion offered, damaged cotton in America and ship it to Liverpool, where it was to be sold, profits or losses to be equally divided between the parties. This letter, which was addressed to the plaintiff and was signed "Samuel S. Vinal & Co," was as follows:

"At the request of Mr. E. J. Taylor [one of the defendants] we beg to inform you that we have made arrangements with him to transact his cotton business through us, and wish to state that any consignments or shipments of cotton on direct orders we may make to you or your brokers, Messrs. Higgins, Roberts & Steele, will be entirely under Mr. Taylor's supervision and recommendation.

"We understand that you purpose establishing a permanent credit with The Agency of The Canadian Bank of Commerce, New York, to the extent of $5000 (five thousand dollars) to facilitate financial arrangements over shipments on your Account; in view of this we have opened an account with The First National Bank of Boston, and if you establish this Credit so that our Drafts at 30 Days Sight on Lloyd's Bank, Liverpool, accompanied by documents can be cashed by the Canadian Bank of Commerce, New York, we can make arrangements with the First National Bank of Boston, to negotiate purchases of either Damaged Cotton, sold at Auction, or Regular Sound Cotton on the Market, such as the 110 Bales 'G A Z' just shipped you.

"It is of course understood that any shipments made by us we will hold ourselves responsible for jointly with Mr. E. J. Taylor and you will kindly send us Account Sales, and place credits of all 'Joint Account' and other consignments shipped to you by us to our Account.

"We would mention that we have been established here in Boston, as above, for the past twenty years, and as to our integrity and responsibility we beg to refer you to The Mechanics Trust Co. of Boston. We would add that with Mr. Taylor's assistance, we feel that we shall soon build up an extensive business in Cotton. We purpose discontinuing the other branches of our business and devote our energies and resources entirely to the Cotton line, and shall hope to receive the same valued support from your goodself as we understand you have given to Mr. E. J. Taylor."

Several shipments were made in 1908 according to the following method. The defendants bought a quantity of damaged cotton after consultation with the plaintiff as to the price to be paid, and shipped it to Liverpool, insuring it in America. The defendants drew upon Lloyd's Bank in Liverpool against each shipment, and sent the draft to Higgins, Roberts and Steele, cotton brokers in Liverpool, together with the bill of lading and insurance policies. The draft was indorsed by Higgins, Roberts and Steele, and was accepted and paid by Lloyd's Bank. When the cotton arrived in Liverpool, it was taken to warehouses owned or controlled by the plaintiff and there was dried, aired and sorted out by the plaintiff's employees, so as to be in condition for sale. Higgins, Roberts and Steele furnished money to the plaintiff to pay his employees. The

cotton was then sold by Higgins, Roberts and Steele at the best price they could get, after consulting the plaintiff and obtaining his consent. From the proceeds Higgins, Roberts and Steele paid Lloyd's Bank the amount paid by that bank on the draft, reimbursed themselves for the expenses incurred, paid themselves a commission and credited the profit to the parties or charged them with the loss. Lloyd's Bank required that Higgins, Roberts and Steele, or some other responsible broker, should be thus engaged in the transaction, so that the bank might have such broker to hold responsible to itself.

It was agreed between the plaintiff and the defendants that their purchases, shipments and sales should be on joint account, and that profits and losses should be equally divided between them.

The plaintiff contended before the master that in these transactions the plaintiff and the defendants were quasi-partners; that the plaintiff had incurred debts and expended money for the benefit of the concern, and was entitled to be repaid one half thereof by the defendants; that Higgins, Roberts and Steele were employed by the plaintiff as his agents and not as the agents of the concern. The defendants contended that Higgins, Roberts and Steele were principals with whom the quasi-partnership dealt; that in such dealings the plaintiff acted as principal for himself and as agent for the defendants; that certain of the plaintiff's acts were unauthorized by the defendants and that he was not entitled to recover from the defendants any losses resulting from such unauthorized acts; and that, if the defendants were liable to anybody, they were liable to Higgins, Roberts and Steele.

In addition to the above the master found the following facts bearing upon the relation of Higgins, Roberts and Steele to the parties.

The original agreement was that the defendants should buy the cotton in America after consultation with the plaintiff as to the price to be paid, and should send it to Liverpool, where the plaintiff was to attend to preparing it for market and selling it. The plaintiff also was to make such provisions as that drafts on Lloyd's Bank by the defendants accompanied by bills of lading and insurance policies might be cashed by the defendants in New York or Boston. It was not part of the agreement that Higgins, Roberts and Steele should necessarily be the brokers. They had long been

the plaintiff's brokers and the defendant Taylor, who had formerly lived in Liverpool, was acquainted with them, and for this reason they were employed, and also for the reason that Lloyd's Bank required that a responsible broker should be engaged in the transaction. Higgins, Roberts and Steele, upon completing the sale of each shipment, rendered an account thereof to each party, heading the same "Sold on account of Thomas Craig & Co., Liverpool in joint account with S. S. Vinal & Co., Boston," or "Sold on account of Messrs. Thomas Craig & Co. and Messrs. S. S. Vinal & al." Each account stated the result in profit and loss, and in some of them one half of such profit or loss was stated as due to or from T. Craig & Co. and one half to or from S. S. Vinal & Co. Profits on joint account transactions were credited one half to each and in some cases the defendants were authorized to draw on the brokers for their portion. Losses were charged by the broker, one half to each party. The defendants bought the cotton in America in their own name, the sellers drawing upon them for the price with bills of lading attached, but the defendants procured funds for meeting these drafts by discounting the drafts against Lloyd's Bank. Consignments were made by the sellers direct to Liverpool. Bills of lading were made to the shippers' order, and were indorsed by them and came to the defendants with the drafts upon the defendants above mentioned. The bills of lading then were attached by the defendants to the drafts on Lloyd's Bank. These drafts were drawn by the defendants on Lloyd's "notify Higgins, Roberts & Steele." They were paid by Lloyd's on Higgins, Roberts and Steele's account, the latter charging the amounts to the joint account. These brokers had complete and exclusive supervision of the working and distribution of the cotton from the time it arrived in Liverpool, holding it as security for the money advanced and warehousing it in their own name on the joint account of the parties. The money required for all expenses of working the cotton, including the payment of Craig's employees, was advanced by them and charged against the transaction. Most of the defendants' general correspondence relating the transactions was with Craig, but in relation to finance and the state of accounts they corresponded both with Craig and also directly with the brokers. The latter rendered the accounts in duplicate, one to each party.

After the Mancunia cotton arrived in Liverpool, a question hav-

ing arisen between the parties as to the prices at which the cotton should be sold, Craig came to America and procured from the defendants and sent to the brokers a paper signed by the defendants reading as follows:

"Messrs. Higgins, Roberts and Steele, Liverpool.

"Dear Sirs: We hereby authorize you to use your entire discretion as to the disposal of all cotton in your hands on Joint Account ourselves and Messrs. Thomas Craig & Co. (subject of course Mr. Craig's sanction). S. S. Vinal & Co."

Demands were made for payment for the balance due from the defendants on the joint account by both the plaintiff and Higgins, Roberts and Steele. The transactions specified in the second and fifth paragraphs of the bill were joint account transactions made under the arrangement and in the manner above set forth.

"My conclusion on this branch of the case is that Higgins, Roberts and Steele were not principals, but were brokers for the plaintiff, advancing money on his account and looking to him for final reimbursement; that the form of their statements was to distinguish these transactions from others in which the plaintiff was acting alone and that they are not creditors of the defendants.

"Taking up plaintiff's claim in detail.

"His first claim is contained in the second paragraph of the bill, and is for one half the loss on a shipment of forty-eight bales of cotton on the S. S. Cestrian, said one half amounting to $97.67, with interest from October 23, 1908, when the same was demanded. This claim is not disputed except that defendants contend that on evidence it is due to Higgins, Roberts and Steele.

"His second claim is contained in the third paragraph of the bill. The defendants here made a shipment of cotton to the plaintiff. The plaintiff complained of the condition of thirty-seven bales, and the defendants agreed to take them back and replace them with thirty-seven bales of equal weight and better quality. They sent thirty-seven bales, but not of equal weight with those returned, and agreed to pay for the deficiency in weight the sum of $30.70, with interest from October 23, 1908, when the same was demanded. This claim is not disputed by the defendants.

"His third claim is contained in the fourth paragraph of the bill. Certain cotton shipped by S. S. Chattahoochee had been sold at a profit, of which the plaintiff's share amounted to $61.55. The

defendants had received the proceeds, but did not pay the plaintiff his share. The defendants admit this amount to be due. The plaintiff further claims interest thereon from November 20, 1908, but this the defendants dispute. I find that payment was demanded in a letter of Higgins, Roberts and Steele to the defendants February, 27, 1909.

"His fourth claim is contained in the fifth paragraph of the bill, and is for one half the loss sustained on a shipment of cotton on S. S. Mancunia, said one half amounting to $2,371.55, on which interest is claimed from February 27, 1909. This claim the defendants dispute.

"His fifth claim is contained in the sixth paragraph of the bill, and is for damages arising from the negligence of the defendants in the purchase of the cotton shipped on S. S. Mancunia. This claim the plaintiff waives.

"His claims in the first and seventh paragraphs of the bill are general, and contain nothing not included in paragraphs two to five.

"On this claim the defendants owe the plaintiff the sum of $2,371.51, with interest from February 27, 1909, when demand for payment was duly made."

The defendants excepted to the following findings and rulings of the master as not being supported by the facts found:

1. To the finding that Higgins, Roberts and Steele were brokers for the plaintiff.

2. To the finding that Higgins, Roberts and Steele advanced the money on joint account transactions on the plaintiff's account.

3. To the finding that Higgins, Roberts and Steele are not creditors of the defendants.

6. To the finding and ruling that the defendants owe the plaintiff on the Mancunia shipment the sum of $2,371.51, with interest from February 27, 1909; and the defendants assigned the further ground for this exception, that the plaintiff is one of two joint parties, or partners, suing for contribution without having himself first paid the claim or loss to which contribution is sought.

Upon these exceptions *Hardy*, J., made the order, "Overruled," and later made a final decree reciting, "that the defendants' exceptions to the master's report had been duly overruled, and the master's report duly confirmed," and ordering that the defendants

pay to the plaintiff the sum of $3,219.35 with costs taxed in the sum of $277.03.    The defendants appealed.

J. E. Macy, for the defendants.

J. B. Studley, for the plaintiff.

BRALEY, J.    If the docket entry on the exceptions to the master's report of "Overruled" and nothing more is to be deemed an interlocutory decree, which we do not decide, the defendants did not appeal, but waited until entry of the final decree, which merely recites that the exceptions have been duly overruled, and the report confirmed.    The final decree is not erroneously affected by the orders recited, and the only question before this court on appeal is, whether it is in accordance with the pleadings and the report.    R. L. c. 159, § 26.

The master's findings would be decisive, even if his general conclusion appeared to be inconsistent with any subordinate finding. *Taber* v. *Breck,* 192 Mass. 355.    *Crosier* v. *Kellogg,* 210 Mass. 181, 184, 185.    *Hughes* v. *Northampton Street Railway,* 210 Mass. 206, 210.    But the report shows no inconsistency.

The parties were mutually engaged in the purchase and shipment of damaged cotton, which, after it had been renovated by the plaintiff, was put upon the market and sold under an agreement to divide the profits and share the losses equally.    A partnership having been formed, either party could bind the other when acting in furtherance of the common enterprise and in the course of business outlined in the letter of the defendants to the plaintiff, which constitutes the contract.    *McMurtrie* v. *Guiler,* 183 Mass. 451. *Feigenspan* v. *McDonnell,* 201 Mass. 341.

While the bill is inartificially drafted, it asks for an accounting in which the defendants join specifically in the answer.    It is alleged, and the master has found, that by reason of losses in the ventures the defendants are indebted to the plaintiff by whom the joint liabilities have been met.    The claims set forth in the second, third, and fifth paragraphs of the bill, the master states were not in dispute, while the plaintiff waved his claim under the sixth paragraph, leaving nothing for determination under the general claims contained in the first and seventh paragraphs.

It is only over the claim in the fifth paragraph for one half of the loss sustained by the plaintiff on a shipment of cotton, which the master has allowed, that the parties are in dispute.    The cotton

was sold by a firm of brokers who had disposed of previous shipments, furnishing to each party a statement of the sales. If in selling the cotton in question they acted for the firm, the decree is wrong. The brokers would be the creditors of the firm as they had advanced money in anticipation of sales, holding the cotton as security for their reimbursement. But the report goes at large into the relations and transactions of the brokers not only with the firm but with the plaintiff individually. It was a question of fact, in view of the letter and the general course of dealing, whether the brokers made the advances to the plaintiff or to both parties as of the date entered on their books. The letter when speaking of the plaintiff refers to the brokers by name as "your brokers," and the master finds that they "had long been" employed by him, using different forms of statement after the contract, to designate or distinguish transactions in which he alone was interested, from those appertaining to the firm. The finding that the money was advanced solely on the plaintiff's account makes the brokers his agents, and, as he has suffered the loss which was incurred in the joint business, the defendants are liable for one half the amount as stated in the report, and in the decree.

*Decree affirmed with costs.*